**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
|       Plaintiff, | ) | |
| | ) | |
|   v. | ) | Civil Action No. _2:19-CV-1_180 |
| | ) | |
| UNIVERSITY OF PITTSBURGH – | ) | **Complaint** |
| OF THE COMMONWEALTH | ) | |
| SYSTEM OF HIGHER | ) | **JURY TRIAL DEMANDED** |
| EDUCATION | ) | |
|       Defendant. | | |

**COMPLAINT**

AND NOW COMES, Plaintiff John Doe[1] ("Doe") by and through his undersigned counsel, Kukoyi Law Firm, LLC and Lanre Kukoyi, Esquire, files this Complaint against Defendant University of Pittsburgh for gender-based discrimination and breach of contract, and in support avers as follows:

**Jurisdiction and Venue**

1. This action arises in part under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX") and Due Process clause of the Fourteenth Amendment to the U.S. Constitution brought pursuant to 42 U.S.C. § 1983.

2. Jurisdiction over Plaintiff's claims is conferred on the Court by 28 U.S.C. §§1331, 1343 and 1367.

3. Venue in this District is proper under 28 U.S.C. §1391(b).

---

[1] Plaintiff files herewith a motion to proceed pseudonymously

## The Parties

4. Plaintiff incorporates the preceding paragraphs by reference as if fully rewritten herein.

5. Plaintiff John Doe is a natural person and is a resident of Allegheny County, Pennsylvania. At all relevant times, he was a student at the University of Pittsburgh Medical School ("Medical School").

6. Jane Roe ("Roe") is a non-party student of the same medical school and the Complainant in the underlying Title IX disciplinary proceeding against John Doe.

7. John Doe seeks to use the pseudonyms "John Doe" and "Jane Roe" in this Complaint in order to preserve his privacy and the privacy of the student who raised the allegations against him, as the subject of this Complaint relates to intimate and personal matters. A separate motion to support this request will be filed contemporaneously with this Complaint.

8. The public's interest in knowing the identities of both Doe and Roe is outweighed by privacy concerns. The use of pseudonyms would not prejudice the Defendant because it is aware of the identities of both Doe and Roe. Lastly, as this case involves matter of utmost personal intimacy and academic records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232(g), disclosure of their identities would cause both Doe and Roe utmost irreparable harm.

9. Defendant is a state-related university within the Pennsylvania system of higher education. It has as its primary address 4200 Fifth Ave, Pittsburgh, PA 15260.

## Facts

10. Plaintiff incorporates the preceding paragraphs by reference as if fully rewritten herein.

### The relationship between Plaintiff and Jane Roe

11. Doe and Roe began having friendly interactions in the summer of 2016 when he attended a summer program at the medical school.

12. Things progressed to point where they began spending time together, including Roe picking up and dropping off Plaintiff.

13.  During this period, while both parties kissed and engaged in consensual foreplay and fondling, there was no sexual intercourse.

14. By the end of the summer, Roe found out that Plaintiff was married but his wife had not moved with him to Pittsburgh when he went for the summer program at the medical school.

15. Plaintiff's wife subsequently moved to Pittsburgh by the end of July 2016, and he cooled things off between him and Roe.

16. However, apparently unknown to Plaintiff, Roe thought of him as "her man" and resolved to do anything in her power to win his affections back.

17. In early August 2016, Roe was on her way to drop Plaintiff off at his apartment when she told him that had to stop at her apartment first to check on the state of her apartment since her roommate was not around.

18. When they got into the apartment, Roe stripped down to her underwear and eventually, both she and Plaintiff began consensual foreplay. At some point,

she took off her underwear and was fully naked, while Plaintiff was still wearing his pants.

19. Roe then attempted to perform oral sex on Plaintiff, but after initially acquiescing for some seconds, Plaintiff asked her to stop because he felt she was only doing so to make him change his mind about not wanting a relationship with her.

20. Roe stopped as requested, but after a few minutes of conversation she climbed on top of him where he was laying (he was on her bed as there was no chair in the room) and began to grind herself on him.

21. Plaintiff asked repeatedly asked her to stop, that sexual intercourse between them would not change his mind regarding a relationship with her.

22. While pleading with her to stop and get off him, he moved because of sudden pain she caused when she accidentally put pressure on his testicles.

23. In a coquettish manner, Roe said that she noticed that he was now interested in having sex with her.

24. At this juncture, Plaintiff, deciding things had gone far enough, he got up and scolded her that hat he had repeatedly told her he did not want a relationship, and sex would not make him change his mind.

25. Roe then told him not to tell anyone what transpired and he responded that he does not kiss and tell.

26. Plaintiff got dressed and after realizing that Roe was no longer going drop him off at his apartment, he left Roe's apartment and walked home.

27. That evening, he called Roe as they had previously made plans to have dinner with other classmates. Roe, however, did not answer.

28.  Eventually, Plaintiff was able to talk with Roe, who told him that she called a friend because she was angry he had turned her down and her friend advised her to report to the Police that Plaintiff attempted to rape her, even though that was not what happened. Thereafter, Roe apologized to Plaintiff.

29. Subsequent to the apology, Plaintiff and Roe continued to hang out, study together, and engage in consensual kissing and fondling.

30.  About two weeks later, Roe went to Plaintiff's apartment and this time around, they had consensual sexual intercourse.

31. However, unknown to both of them, Plaintiff's wife returned and met them in a compromising situation.

32. Subsequent to that day, Roe accused Plaintiff of setting her up so that his wife would walk in on them in order to get back at her because she had claimed she told the police he attempted to rape her.

33.  Plaintiff's wife was able to identify Roe through Plaintiff's Facebook account and got in contact with Roe, and subsequently, they had a few conversations via the app.

34. These conversations took place while Plaintiff's wife was in Cincinnati, Ohio and she recorded one of them.

35. On the recording, Roe could be heard saying that whatever happened between her and Plaintiff that led to claims of her filing a police report was a misunderstanding.

36. At no point during their conversations did Roe inform Plaintiff's wife that she was sexually harassed or worse by Plaintiff.

**Title IX Complaint and the University Investigation**

37. Almost two years later, July 10, 2018 to be exact, Plaintiff received a letter, dated the same day, from the University of Pittsburgh's Office of Diversity and Inclusion ("ODI"), that the university's Title IX Office, will be investigating allegation of sexual misconduct that was filed by Roe against Plaintiff. The university's Title IX Office is a part of the ODI and the letter was authored by Ms. Kristy Rzepecki ("Rzepecki"). Rzepecki was the investigator of the allegations.

38. According to its letter, the investigation would occur through a neutral fact-finding process. However, this was not the case.

39. For example, during Plaintiff's first meeting with Rzepecki on August 10, 2018, she noticed his wedding ring and asked him if he was married. When he answered in the affirmative, her entire demeanor towards him changed from being warm and open, and she had an open expression of distaste. She then asked him about times that he did not wear the ring and when he asked her for the reason behind her question, she ignored him and moved on to a different topic.

40. Another example of the biased nature of the Title IX investigative process was the investigator's approach to questioning Plaintiff's witnesses. Plaintiff was asked to provide a list of witnesses and state why he listed the individual as a witness. At least one of the witnesses, Stephen Canton, told Plaintiff that, when

the Title IX investigator contacted him, the investigator did not ask him any question pertaining to why Plaintiff listed him as a witness.

41. Additionally, the final report of the investigator did not include statements from Plaintiff's wife regarding the consensual nature of what she witnessed on the day she walked in on Plaintiff and Roe. When Plaintiff brought this matter up after he reviewed the final report, the investigator told him that his wife is not a credible witness because she recorded Roe. (As part of his defense to the allegations, Plaintiff provided the investigator with an audio file of a Facebook messenger conversation between his wife and Roe where Roe essentially indicated that she was the instigator of the sexual encounter between her and Plaintiff).

42. The above-referenced audio file was not accepted by the investigator because it was "inadmissible", although in Chapter 5, paragraph D, page 18 of its Student Code of Conduct, Defendant stated that "…legal rules regarding admissibility of evidence will not be formally applied."

43. Also, the University Chancellor, in his comment on the proposed Department of Education ("Department") rulemaking on Title IX that the department issued on November 29, 2018, indicated that the University does not make evidentiary rulings.

44. Plaintiff's wife made the recording while in Cincinnati, OH. Ohio is a one-party consent state for purposes of recordings; therefore the recording was actually admissible.

45. The issue of admissibility notwithstanding, Rzepecki should have listened to the audio and included the entire testimony from Plaintiff's wife in her final report. Her failure to do so is another example of how biased the investigation was against Plaintiff.

46. Another example that the investigator was not as neutral as promised was the fact that when Plaintiff reviewed the investigator's report prior to its submission, Plaintiff saw clear evidence of implicit bias. The investigator repeatedly recorded Complainant's testimony as fact (such as "this happened or that happened") but recorded Plaintiff's testimony in the third party (such as "Respondent alleges or Respondent states"). The impact this would have on any subsequent reviewer of the report cannot be overemphasized.

47. A further example of the non-neutral nature of the investigation occurred when the Title IX investigator interviewed Plaintiff's wife, Plaintiff's wife states that the focus of the interview questions was on whether there was domestic violence in her marriage with Plaintiff.

48. Additionally, Plaintiff read in Rzepecki's report that his wife told Rzepecki that she (his wife) believed Roe because Roe had no reason to lie. Plaintiff's wife vehemently refutes this. In fact, what she told Rzepecki was that because of the familiarity she had with Plaintiff, her husband, she can tell when he is being untruthful in his stories and he was not being untruthful with her regarding the nature of what took place between himself and Roe.

49. It appeared that Rzepecki was selective in the testimony she included in her report. In fact she stated to Plaintiff that "it is her prerogative as to what details or information is relevant to the case.

50. Plaintiff never got an opportunity to review the evidence against him with an attorney, as he was not permitted to take any of the documents, make a recording or take notes when he was reviewing the documents by himself.

**<u>Bias</u>**

51. Prior to the Title IX investigation into Plaintiff, Defendant had experienced some negative coverage by its university-affiliated newspapers regarding its handling of Title IX complaints. For example, on November 13, 2017, in The Pitt News, a publication accessible to all of Defendant's students, there was a report that a female student at the School of Law at the University filed a lawsuit alleging that the University mishandled her Title IX complaint.

52. In the lawsuit, Rzepecki was alleged to have been extremely biased and unprofessional.

53. The lawsuit was filed in on October 25, 2017, well before the initiation of the Title IX investigation against Plaintiff.

54. Plaintiff had also raised some concerns of treatment at his school. For example, on September 2017, Plaintiff  complained to the senior vice chancellor for the Health Sciences. School of Medicine regarding what he perceived racial bias in grading and preparation of minorities for the medical board exams.

55. On October 19, 2017, he raised the same concerns with another faculty member during the Step 1 planning meeting.

56. On March 1, 2019, Plaintiff once again raised concerns over his grades, this time in surgery clerkship. This concern was addressed by the medical school's associate dean of student affairs and the grade was corrected on April 8, 2019.

57. Plaintiff filed another grievance regarding his grade on April 26, 2019, in his pediatric clerkship. This grievance was unresolved when Plaintiff was suspended.

58. On April 30, 2019, at or about 2:23pm, Plaintiff received an email from the Associate Dean of Student Affairs asking him to attend a meeting with her and the Assistant Dean of Student Affairs that evening. However, when he arrived at the medical school shortly after 5pm, the University Police was called and they escorted him off the campus, although he told them about the meeting he was asked to attend. He even asked the police officers to permit him to walk out alone, but his request was denied and he was escorted out. Some of his classmates were present in the building.

59. It is noteworthy that both the Associate Dean and the Assistant Dean were Roe's witnesses in the Title IX investigation, as they claimed to have been aware for a couple of years that Roe's academic struggles were because of the August 2016 incident.

60. Yet, the Assistant Dean twice sponsored Plaintiff to conferences to represent the school during the period he claimed to have had knowledge that Plaintiff sexually harassed Roe

61. Additionally, in August 2017, Plaintiff was asked by the School of Medicine to become a student tutor, where he would teach other students one-on-one. It is impossible to believe that either one of the two Deans was not part of the process or aware of the process by which he was selected to be a student tutor.

62. Plaintiff would not have been selected for the conferences or to be a student tutor if it was true that, as the Deans allege, that they were aware of sexual misconduct on his part.

**The Department of Education guidelines on Title IX Investigations**

63. All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal financial assistance must comply with Title IX.

64. Upon information and belief, the implemented standards, criteria, and policies employed and guiding the University were exercised under the auspices of, and pursuant to the U.S. Department of Education's Office for Civil Rights April 4, 2011 "Dear Colleague Letter" student-on-student sexual harassment and sexual violence (also hereafter referred to as "Dear Colleague Letter"). (This Dear Colleague Letter is Available at http: /www.v2.ed.gov/print /about/offices/list/ ocilletters/colleague-20 1 104.html).

65. The 2011 Dear Colleague Letter and the 2014 guidance required schools to adopt a minimal standard of proof when administering student discipline. The 2011 Letter discouraged cross-examination by the parties and suggested that to recognize a right to such cross examination might violate Title IX. Furthermore, the 2011 Letter limited any due process protections given to

11

accused students as it directed that no unnecessary delay should exist when resolving charges.

66. On September 7, 2017, Betsy DeVos, the U.S. Secretary of Education, announced that "Rule by [the 2011] Letter is over." In a public address she expressed concerns raised by members of academia that the approach pushed by the U.S. Department of Education for the previous several years exerted improper pressure on universities to adopt Title 1X procedures that do not afford fundamental fairness to all students. Secretary DeVos advised that she thought the professors who raised these concerns were right and described the system as failed and one that imposed policy without even the most basic safeguards.

67. In a September 22, 2017, Dear Colleague Letter, the U.S. Department of Education, Office of Civil Rights released a notice stating that while the 2011 and 2014 guidance documents may have been well intentioned, they have led to the deprivation of rights for many students and they have denied fair process to accused students. The Office of Civil Rights advised that the April 2011 Dear Colleague Letter's "improper pressure upon universities" resulted in universities developing procedures for resolving sexual misconduct complaints that lacked the "most basic elements of fairness and due process, are overwhelmingly stacked against the accused. and are in no way required by Title IX law or regulation." See https://www 2.ed.gov/about/officesilistiocrilettersicolleague-title-ix-201709.pdf

68. In September 2017 the Office of Civil Rights provided specific guidance for universities with respect to grievance procedures and investigations. It is this

guidance that should have served as the standard for the investigation of matters
involving John Doe and the determination by the University.

69. The Defendants were aware of the announcement by the Secretary of Education
Betsy DeVos and the Department of Education's new guidance. Despite this, the
Defendants failed to exercise their authority to modify their unconstitutional pol-
icies or practices.

## COUNT I
## VIOLATION OF TITLE IX

70. Plaintiff incorporates each of the preceding paragraphs as if set forth fully
herein.

71. Title IX, in relevant part, says that "No person in the United States shall on the
basis of sex, be excluded from participating in, be denied the benefits of, or be
subjected to discrimination under any education program or activity receiving
federal financial assistance."

72. Because Defendant University receives federal financial assistance, it is sub-
ject to Title IX.

73. Title IX bars the imposition of university discipline where gender is a moti-
vating factor in the decision to discipline.

74. As stated in the preceding paragraphs, the Title IX investigation conducted
was riddled with bias against Plaintiff.

75. Due to the gender bias present in its Title IX investigation, Defendant Uni-
versity reached an erroneous outcome in this matter.

76.  Defendant failed to conduct a thorough and impartial investigation of the alle-
gations brought against Doe.

77. As a result of the actions taken by Defendant, Doe has been suspended for one year, severely jeopardizing his education and future goals.

78. As a result of Defendant's actions, Doe has sustained and continues to sustain damages to his education and his career opportunities, as he was erroneously adjudged to be responsible for an offense he did not commit.

79. A finding of sexual misconduct placed in Doe's academic records would severely hinder his goal to become a medical doctor.

80. If Plaintiff is still able to become a medical doctor, he would have lost at least one year of salary as he is now at least a year behind the rest of his class.

WHEREFORE, Plaintiff asks for a judgment for compensatory damages in an amount to be determined at trial, plus costs reasonable attorney fees recoverable under Title IX.

### COUNT II
### VIOLATION OF THE FOURTEENTH AMENDEMENT, BROUGHT PURSUANT TO 42 U.S.C. § 1983

81. Plaintiff incorporates each of the preceding paragraphs as if set forth fully herein.

82. Defendant University is a state related educational institution and has been found by the Courts of Pennsylvania to be a state actor.

83. Pursuant to the fourteenth amendment, state actors cannot deprive a person of his life, liberty or property without due process of law.

84. Plaintiff possesses a property interest as a student at the Medical School, as well as a liberty interest in his reputation.

85. At all times relevant, the Title IX investigation was carried out by state actors or other actors acting under the color of the law.

86. As stated above, Defendant did not undertake a neutral and objective fact finding with regard to Plaintiff alleged misconduct under Title IX.

87. Defendant's conduct violated Plaintiff's due process rights in the process.

88. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer damages, including but not limited to, severely hampered educational opportunity, loss of future income, humiliation and mental anguish.

WHEREFORE, Plaintiff asks for a judgment for compensatory damages in an amount to be determined at trial, plus costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988 against Defendant.

## COUNT III
## BREACH OF CONTRACT

89. Plaintiff incorporates each of the preceding paragraphs as if set forth fully herein.

90. A University handbook and student conduct manual has been viewed as a contract with a student that properly pays his tuition.

91. Plaintiff properly paid his tuition during all relevant periods.

92. Chapter 5, paragraph D, page 18 of Defendant's Student Code of Conduct, states that "…legal rules regarding admissibility of evidence will not be formally applied."

93. Therefore, when Rzepecki refused to accept the audio recording, claiming it was "inadmissible", it constituted a breach of contract with Plaintiff.

94. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer damages, including but not limited to, severely ham-

pered educational opportunity, loss of future income, humiliation and mental anguish.

WHEREFORE, Plaintiff asks for a judgment for compensatory damages in an amount to be determined at trial, plus costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988 against Defendant.

## **JURY TRIAL DEMAND**

Plaintiff hereby makes a demand for a trial by jury on all triable issues.

Date: September 12, 2019                              Respectfully submitted,

/s/ Olanrewaju Kukoyi
Lanre Kukoyi, Esq.
PA I.D. # 315955
Kukoyi Law Firm, LLC
510 Washington Ave,
Carnegie, PA 15106
Voice (412) 725-7701
Facsimile (412) 502-5105
kukoyi@kukoyilaw.com