IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GIDEON NKRUMAH,                          )
                                         )   No. 2:19-cv-1180
            Plaintiff,                   )
                                         )
    vs.                                  )   Judge Robert J. Colville
                                         )
UNIVERSITY OF PITTSBURGH – OF THE        )
COMMONWEALTH    SYSTEM    OF             )
HIGHER EDUCATION,                        )
                                         )
            Defendant.                   )

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

        Before the Court is the Motion for Summary Judgment (ECF No. 48) filed by Defendant

the University of Pittsburgh – of the Commonwealth System of Higher Education (the

"University").  The University seeks judgment in its favor with respect to each of the claims set

forth against the University in the operative Amended Complaint (ECF No. 15) filed by Plaintiff

Gideon Nkrumah ("Plaintiff").  The Court has jurisdiction in this matter pursuant to 28 U.S.C.

§§1331, 1343 and 1367.  The University's Motion has been fully briefed, and is ripe for

disposition.

        I.      **Factual Background & Procedural History**

        In this action, Plaintiff takes issue with a Title IX investigation conducted by the University

that found Plaintiff responsible for sexually assaulting his University of Pittsburgh School of

Medicine ("SOM") classmate, Vivienne Oyefusi.  In the Amended Complaint, Plaintiff asserts the

following claims against the University: (1) Violation of Title IX of the Education Amendments

of 1972 ("Title IX") (Count I); (2) Section 1983 claim for violation of Plaintiff's due process rights

1

under the Fourteenth Amendment (Count II); and (3) breach of contract (Count III).  With respect to Count I, Plaintiff asserts that the Title IX investigation at issue in this case involved bias against Plaintiff on the basis of his gender, and that, due to this alleged bias, the University failed to conduct a thorough and impartial investigation of the allegations brought against Plaintiff and reached an erroneous outcome.  Am. Compl. ¶¶ 72-74, ECF No. 15.  With respect to Count II, Plaintiff avers that: (1) as a student at the SOM, he possesses a property interest in the continuation of his course of study and a liberty interest in his reputation; (2) the University's Title IX investigation was carried out by state actors or other actors acting under the color of the law; and (3) the University's allegedly improper Title IX investigation denied Plaintiff of both a property interest and a liberty interest without due process in violation of the Fourteenth Amendment.  *Id.* at ¶¶ 80-86.  At Count III, Plaintiff asserts that the University's handbook and student conduct manual constitute a contract between the University and Plaintiff, and that the University breached the terms of that contract.  *Id.* at ¶¶ 88-91.

Unless otherwise noted, the following facts are not in dispute:[1]

The University is an institution of higher education that receives federal funding within the meaning of Title IX.  Concise Statement ¶ 1, ECF No. 49.  The University is a state-related institution.  *Id.* at ¶ 2.  Beginning in August of 2016 and during the timeframe relevant herein, Plaintiff, who is male, was a student enrolled at the SOM.  *Id.* at ¶ 3.  The University has a Sexual Misconduct Policy that defines "Sexual Violence" to include sexual assault.  *Id.* at ¶¶ 4-5.  The University also maintains a "Student Code of Conduct" that contains a chapter titled "Sexual Misconduct Process and Procedures: Reporting Sexual Misconduct and University Response" (the "Title IX Process and Procedures"), which describes the process and procedures for the

---

[1] Because Plaintiff has admitted many of the facts set forth in the University's Concise Statement of Material Facts, the Court will cite primarily to the University's Concise Statement in describing the facts that are not in dispute.

University's response to reports of sexual misconduct.  *Id.* at ¶ 6; App. 2. The Title IX Process and Procedures state that any individual who believes that he or she has been the victim of sexual misconduct may file a complaint with the University's Title IX Office.  *Id.* at ¶ 7.  Appendix A to the Title IX Process and Procedures describes the sanctions available to the University if it concludes that an individual has violated the Sexual Misconduct Policy, which include but are not limited to "Disciplinary Probation" and "Disciplinary Suspension."  *Id.* at ¶¶ 8-9.

The University received a Title IX Complaint against Plaintiff on June 26, 2018 arising out of an alleged incident that allegedly occurred on August 19, 2016, and the University investigated this Complaint from June of 2018 until April of 2019.  Concise Statement ¶¶ 11; 24, ECF No. 49. With respect to the same, the University applied the Sexual Misconduct Policy and the Title IX Process and Procedures.  *Id.* at ¶ 10.[2]  The University's Title IX Office handles Title IX investigations.  *Id.* at ¶ 12.  At all times relevant herein, Katie Pope was the University's Title IX Coordinator and Kristy Rzepecki was the University's Senior Title IX and Diversity Specialist. *Id.* at ¶¶ 13-14.  During the timeframe relevant herein, Ms. Rzepecki functioned as a Title IX Investigator and Ms. Pope was Ms. Rzepecki's supervisor.  *Id.* at ¶ 15.

At all relevant times, Vivienne Oyefusi was a student enrolled at the SOM.  Concise Statement ¶ 17, ECF No. 49.  Plaintiff and Ms. Oyefusi were first-year medical students together at the SOM, and met during the summer of 2016, prior to the start of fall classes at the SOM.  *Id.* at ¶¶ 18-19.  Plaintiff and Ms. Oyefusi had a romantic relationship that included frequent consensual sexual contact. *Id.* at ¶ 20.  The University asserts that this relationship did not involve consensual penetrating sexual intercourse, *id.* at ¶ 20, while Plaintiff asserts that he and Ms.

---

[2] Plaintiff does not challenge the University's assertion that the University applied the Sexual Misconduct Policy and the Title IX Process and Procedures with respect to its Title IX investigation, but does aver that the same were not applied equitably to Plaintiff, and further asserts, as noted above, that the University's Title IX investigation was improper and involved bis against Plaintiff.  *See* Resp. to Concise Statement ¶¶ 10-11, ECF No. 53-1.

Oyefusi had consensual penetrative sexual intercourse on August 28, 2016, Resp. to Concise Statement ¶ 20, ECF No. 53-1.  Ms. Oyefusi told Plaintiff that she did not want to have penetrating sexual intercourse prior to marriage.  Concise Statement ¶ 21, ECF No. 49.  Plaintiff denies having non-consensual penetrating sexual intercourse with Ms. Oyefusi on August 19, 2016, although he does admit to having sexual contact with Ms. Oyefusi at her apartment on or about that day.  *Id.* at ¶ 22.

On June 26, 2018, Ms. Oyefusi submitted a Complaint to the University's Title IX Office.  Concise Statement ¶ 24, ECF No. 49.  In her Title IX Complaint, Ms. Oyefusi alleged that she was sexually assaulted by Plaintiff at Ms. Oyefusi's off-campus apartment on August 19, 2016.  *Id.* at ¶ 25.  Plaintiff and the University dispute the nature and details of the August 19, 2016 incident.  *See id.* at ¶¶ 26-31; Resp. to Concise Statement ¶¶ 26-31, ECF No. 53-1.  The University asserts that, during the course of the University's investigation, Ms. Oyefusi alleged that she and Plaintiff were kissing in her apartment on August 19, 2016, that Plaintiff asked Ms. Oyefusi more than once during this encounter to engage in penetrating sexual intercourse, that Ms. Oyefusi rejected these requests,[3] and that Plaintiff sexually assaulted Ms. Oyefusi by penetrating her vagina with his penis.  Concise Statement ¶¶ 25-30, ECF No. 49.  Plaintiff denies these allegations, and asserts that Ms. Oyefusi initiated the sexual contact on August 19, 2016 and further asserts that no penetrating sexual intercourse took place August 19, 2016.  Resp. to Concise Statement ¶¶ 25-20, ECF No. 53-1.

The University avers that Ms. Oyefusi alleged that she felt guilty for telling people that Plaintiff had sexually assaulted her, although she believed that statement to be true.  Concise Statement ¶ 31, ECF No. 49.  Plaintiff contends that Ms. Oyefusi told Plaintiff that Ms. Oyefusi

---

[3] The University's Investigation Report indicates that Ms. Oyefusi stated that she "told [Plaintiff] no and to stop several times" during this incident.  Investigation Report at "Pitt 000229," ECF No. 49-1.

did not believe what happened on the evening of August 19, 2016 was an assault.  Resp. to Concise Statement ¶ 31, ECF No. 53-1.  The University asserts that Ms. Oyefusi alleged that she and Plaintiff had consensual penetrating intercourse at Plaintiff's house on two (2) occasions after the alleged August 19, 2016 sexual assault, Concise Statement ¶ 32, ECF No. 49, and Plaintiff asserts that he and Ms. Oyefusi had penetrative intercourse at his apartment on only one occasion (August 28, 2016), which was the day that Plaintiff's wife walked in on Plaintiff and Ms. Oyefusi, Resp. to Concise Statement ¶ 32, ECF No. 53-1.  Ms. Oyefusi subsequently began seeing a counselor at the University's Wellness Center in August of 2016, and reported to the counselor that she had been sexually assaulted.  Concise Statement ¶ 33, ECF No. 49.  Ms. Oyefusi stated that she cut off all contact with Plaintiff in October of 2016 because she felt unsafe around Plaintiff.  *Id.* at ¶ 34.

On July 18, 2018, the University issued mutual "Interim No Contact Orders" to both Plaintiff and Ms. Oyefusi, and also sent a "Notice of Investigation" to Plaintiff.  Concise Statement ¶¶ 35-36, ECF No. 49.  In response to the Notice of Investigation, Plaintiff indicated that he would not be returning to the University's campus until August of 2018. *Id.* at ¶ 37.  Ms. Rzepecki interviewed Ms. Oyefusi on July 3, 2019.  *Id.* at ¶ 38.  On about August 10, 2018, Plaintiff met with Ms. Rzepecki to review the Notice of Investigation, and Plaintiff requested to be interviewed at a later date.  *Id.* at ¶¶ 39-40.  Ms. Rzepecki interviewed Plaintiff on August 22, 2018.  *Id.* at ¶ 41.

During the Course of the University's investigation, Ms. Oyefusi provided the names of eight witnesses, and Ms. Rzepecki interviewed these witnesses.  Concise Statement ¶ 42, ECF No. 49.  Several of these witnesses testified that Ms. Oyefusi told them, in close temporal proximity to the alleged August 19, 2016 incident, that Plaintiff had sexually assaulted her.  *Id.* at ¶ 43.  Plaintiff provided the names of three witnesses, and Ms. Rzepecki interviewed two of the witnesses, as the

third declined to be interviewed.  *Id.* at ¶¶ 45-46.  One of Plaintiff's witnesses testified as to knowledge of social interactions between Plaintiff and Ms. Oyefusi but did not provide information related to the alleged August 19, 2016 incident.  *Id.* at ¶ 47.  Ms. Rzepecki also interviewed Plaintiff's wife, but did not include Mrs. Nkrumah's statements in the University's Investigation Report (the "Investigation Report"), citing a conflict of interest due to Mrs. Nkrumah's relationship to Plaintiff, as well as Mrs. Nkrumah's creation, without Ms. Oyefusi's knowledge or consent, of an audio recording of a phone call she had with Ms. Oyefusi.  *Id.* at ¶¶ 49-50.  Ms. Rzepecki's Investigation Report specifically provides that Plaintiff's wife's statement was not considered credible to the investigation because of a "conflict of interest, and additional evidence that suggests his wife illegally recorded a conversation with the [Ms. Oyefusi]." Investigation Report at "Pitt 000238," ECF No. 49-1.

Ms. Rzepecki met with Plaintiff to review his interview summary on October 22, 2018.[4] Concise Statement ¶ 52, ECF No. 49.  When Ms. Rzepecki completed her Investigation Report, she notified both Plaintiff and Ms. Oyefusi of their rights to review the Investigation Report prior to finalization.  *Id.* at ¶ 53.  Plaintiff met with Ms. Rzepecki to review the Investigation Report on January 14, 2019 and January 15, 2019.  *Id.* at ¶ 54.  Ms. Oyefusi reviewed the Investigation Report on January 15, 2019 and January 17, 2019.  *Id.* at ¶ 55.  Plaintiff requested, and was granted, additional time to submit more information that he believed was relevant to the investigation.  *Id.* at ¶ 56.  Plaintiff reviewed the Investigation Report again on January 25, 2019.  *Id.* at ¶ 57.  On January 28, 2019, Plaintiff submitted the audio recording of the secretly recorded phone conversation between his wife and Ms. Oyefusi.  *Id.* at ¶ 58.  The University determined that this audio recording should not be considered as evidence in Ms. Rzepecki's investigation because

---

[4] There is a dispute as to whether this was their first meeting to review Plaintiff's interview summary.  Resp. to Concise Statement ¶ 51, ECF No. 53-1.

making an audio recording of an individual without the individual's knowledge and consent is a crime under Pennsylvania law.  *Id.* at ¶ 59.

Ms. Rzepecki subsequently revised the Investigation Report to reflect her decision not to accept the audio recording as evidence, and gave both Ms. Oyefusi and Plaintiff an opportunity to review the revised Report.  Concise Statement ¶ 60, ECF No. 49.  Ms. Oyefusi reviewed the revised Investigation Report on February 8, 2019, and Plaintiff reviewed the revised Report on February 11, 2019.  *Id.* at ¶¶ 61-62.  After making final revisions to the Investigation Report, Ms. Rzepecki again invited Ms. Oyefusi and Plaintiff to review the final Investigation Report, and each subsequently reviewed the final Investigation Report.  *Id.* at ¶¶ 63-65.

In the Investigation Report, Ms. Rzepecki found Ms. Oyefusi to be credible, and further found that Ms. Oyefusi's statements were consistent and that her account was supported by witness testimony.  Concise Statement ¶ 66, ECF No. 49.  Ms. Rzepecki's Investigation Report further stated that Ms. Rzepecki did not find Plaintiff to be credible, but rather found him to be "defensive and evasive during questioning and unable to provide responsive information."  *Id.* at ¶ 67. Applying a preponderance of the evidence standard, Ms. Rzepecki ultimately found Plaintiff responsible for violating the University's Sexual Misconduct Policy, and the University issued the Investigation Report reflecting these findings on April 9, 2019.  *Id.* at ¶ 68.  The final Investigation Report was approved by Ms. Rzepecki's supervisor, and was sent to Dean of Students, Kenyon Bonner, for his review and imposition of sanctions.  *Id.* at ¶ 69.  Dean Bonner accepted the conclusions of the Title IX Office finding Plaintiff responsible for violating the University's Sexual Misconduct Policy, and specifically accepted the Title IX Office's determination that found Plaintiff responsible for "sexual assault," and issued Plaintiff sanctions.  *Id.* at ¶¶ 70-71.  Dean Bonner imposed the following sanctions:

[Plaintiff] was placed on Disciplinary Suspension for one year (i.e., through April 2020);

[Plaintiff] was directed that, prior to returning to the University, he would be required to complete a Title IX training workshop conducted by the Title IX Office;

[Plaintiff] was placed on Disciplinary Probation for the duration of his University enrollment;

The Interim No Contact Order previously issued between [Plaintiff] and [Ms.] Oyefusi was made permanent; and

[Plaintiff] was advised that, should he be found responsible for another Title IX-related incident, he may face immediate dismissal from the University.

*Id.* at ¶ 72.

Plaintiff and Ms. Oyefusi were notified of the outcome of the Title IX Investigation by way of a letter sent on April 29, 2019.  Concise Statement ¶ 72, ECF No. 49.  On May 9, 2019, Plaintiff submitted a "Petition for Appeal and Postponement of Sanctions."  *Id.* at ¶ 74.  Ms. Rzepecki notified the University Review Board of Plaintiff's appeal on May 10, 2019.  *Id.* at ¶ 75.  The University Review Board consisted of three University employees, and specifically two faculty members and a moderator, who the University asserts had no prior knowledge of Ms. Oyefusi, Plaintiff, Ms. Oyefusi's Title IX Complaint, and/or the Title IX Office's investigation.  *Id.* at ¶ 76. On May 29, 2019, the University Review Board denied Plaintiff's appeal and upheld the sanctions issued by Dean Bonner.  *Id.* at ¶ 77.  Plaintiff subsequently served his one-year Disciplinary Suspension, underwent the required Title IX training, and returned to his degree program in May 2020.  *Id.* at ¶ 78.  As of the filing of the University's Motion for Summary Judgment, Plaintiff was on track to, and presumably did, complete his degree program at the SOM in May of 2021. *Id.* at ¶ 79.

Plaintiff filed the Amended Complaint on November 21, 2019.  The University filed an Answer (ECF No. 18) to the Amended Complaint on December 18, 2019.  Following the

completion of fact discovery in this matter, the University filed its Motion for Summary Judgment, along with a Concise Statement of Material Facts (ECF No. 49), an Appendix of Exhibits (ECF No. 49-1), and a Brief in Support (ECF No. 50).  On June 21, 2021, Plaintiff filed a Brief in Opposition (ECF No. 53) to the University's Motion for Summary Judgment, along with a Response (ECF No. 53-1) to the University's Concise Statement of Material Facts.  The University filed a Reply (ECF No. 57) on July 21, 2021.

## II.     Legal Standard

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).  Although the movant bears the burden of establishing that there is no genuine issue of fact, the non-moving party "is not thereby relieved of his own burden of producing in turn evidence that would support a jury

verdict." *Liberty Lobby*, 477 U.S. at 256.  "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Id.*; *see also Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000) ("At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." (citing *Celotex*, 477 U.S. at 324)).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment.  Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment.  *Liberty Lobby*, 477 U.S. at 248.

## III.  Discussion

As noted above, the University moves for summary judgment in its favor as to each of the claims set forth against it by Plaintiff in this matter.  The University asserts that the record evidence refutes Plaintiff's allegations, and that there exists no genuine dispute of material fact that: (1) the University did not discriminate against Plaintiff based upon his gender in violation of Title IX; (2) Plaintiff's Title IX claim fails under both the "erroneous outcome" and "selective enforcement" theories of Title IX recovery; (3)  the University did not deny Plaintiff procedural due process in violation of the Fourteenth Amendment; and (4) the University's Student Code of Conduct cannot have created an enforceable contract between the University and Plaintiff because the University is a state-related institution, and, in any event, the record shows that the University did not breach the Student Code of Conduct in this case. Mot. ¶¶ 4-9, ECF No. 48; Br. in Supp. 16, ECF No. 50. Plaintiff opposes summary judgment as to each of his claims, and argues that the record does not

support summary judgment in the University's favor as to any of Plaintiff's claims.  *See* Br. in

Opp'n, ECF No. 53.

### A.  Count I (Title IX Claim)

In support of his Title IX claim, Plaintiff avers that the University's Title IX investigation

did not involve a neutral fact-finding process.  Am. Compl. ¶ 36, ECF No. 15.  In the Complaint,

Plaintiff specifically relies on allegations that the University's Title IX investigation was improper

and involved bias on the following bases: (1) the University's Title IX Investigator Kristy

Rzepecki's demeanor towards Plaintiff changed from pleasant to distasteful when she learned that

Plaintiff was married, *id.* at ¶ 37; (2) Ms. Rzepecki's questioning of Plaintiff's witnesses during

the investigation was inadequate, *id.* at ¶ 38; 45; (3) Ms. Rzepecki's failure to include statements

from Plaintiff's wife in the final Investigation Report regarding Plaintiff's wife's observation of

an alleged August 28, 2016 sexual encounter between Plaintiff and Ms. Oyefusi, and Plaintiff's

wife's statements regarding her perception that the encounter was consensual, on the basis that

Plaintiff's wife was not a credible witness because she made a recording of a conversation with

Ms. Oyefusi, *id.* at ¶ 39; (4) Ms. Rzepecki's failure to consider the audio recording that Plaintiff's

wife made of a conversation between Plaintiff's wife and Ms. Oyefusi, *id.* at ¶¶ 39-43; (5) the

language of the report "repeatedly recorded Complainant's testimony as fact (such as 'this

happened or that happened') but recorded Plaintiff's testimony in the third party (such as

'Respondent alleges or Respondent states')"; (6) Plaintiff was not permitted to review evidence

with an attorney, *id.* at ¶ 48; and (7) Dean Joan Harvey and Dr. Chentis Pettigrew, who are

employed by the University and who served as witnesses for Ms. Oyefusi during the Title IX

investigation and stated that they had been aware since 2016 that Ms. Oyefusi's academic struggles

were related to an alleged August 2016 sexual assault, treated Plaintiff favorably by sponsoring

Plaintiff to attend conferences and requesting that he serve as a student tutor following the August 2016 incident but prior to the University's investigation.  Plaintiff asserts that Dean Harvey and Dr. Pettigrew would not have done so had they, as they stated during the Title IX investigation, been aware of allegations of sexual misconduct on Plaintiff's part.  Plaintiff asserts that, accordingly, Ms. Rzepecki thus should not have found their testimony to be corroborative of Ms. Oyefusi's allegations. *Id.* at ¶¶ 56-60.

In his Brief in Opposition, Plaintiff further asserts that the University discriminated against Plaintiff on the basis of gender because of external pressure the University faced from: (1) "the fact that [the University] had some negative [media] coverage regarding its handling of Title IX Complaints[,]" and specifically an article regarding the filing of a lawsuit against the University by a female student at the University's School of Law that "claimed that Kristy Rzepecki [] was biased [against the female student] in her [Title IX] investigation"; and (2) the U.S. Department of Education's  issuance of a "Dear Colleague" letter in 2011 with respect to how reports of sexual harassment and sexual violence should be handled in educational institutions receiving federal funding.  Br. in Opp'n 3-4, ECF No. 53.  Plaintiff asserts that these external pressures lend support to his allegations of bias against the University.  *Id.*

"Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline."  *Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 773 (3d Cir. 2020) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).  "[T]o state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex."  *Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020).

While Plaintiff has asserted the above conclusory assertions of bias in his Amended Complaint, Plaintiff has offered no evidentiary support for these assertions whatsoever, nor has Plaintiff pointed to any evidence submitted by the University that indicates discrimination on the basis of Plaintiff's gender.  The Court has thoroughly reviewed the evidence of record, which tends to indicate that Plaintiff and Ms. Oyefusi were afforded the same procedural mechanisms during the course of the Title IX investigation, including opportunities to be interviewed and present their respective accounts of the incident in question, to review interview summaries, to propose relevant evidence and witnesses, to review all drafts of the Investigation Report, to submit additional evidence and to propose questions for witnesses (including questions for one another),[5] to have an advisor present during any proceeding or meeting in the course of the investigation, and to appeal the Investigation Report's conclusion.  The Court finds nothing in the record, including the face of the Investigation Report and the additional exhibits submitted by the University, that indicates that Plaintiff's gender was in any way a motivating factor for the University's decision to discipline Plaintiff.

"Title IX prohibits discrimination in education 'on account of sex;' it does create a cause of action for generalized deficiencies in a school's investigatory or adjudicatory process." *Gendia v. Drexel Univ.*, No. CV 20-1104, 2020 WL 5258315, at *3 (E.D. Pa. Sept. 2, 2020); *see also Knoch v. Univ. of Pittsburgh*, No. 2:16-CV-00970-CRE, 2016 WL 4570755, at *6 (W.D. Pa. Aug. 31, 2016) ("Due process does not require that a student be permitted to enter all favorable evidence and Plaintiff cites to no legal authority for the proposition that a non-treating physician be permitted to provide expert testimony as to the mental faculties and credibility of an accuser at the disciplinary hearing.").   Each of the conclusory allegations set forth in Plaintiff's Amended

---

[5] "At the request of [Plaintiff], the investigator asked [Ms.] Oyefusi again who was on top of who when the assault occurred."  Investigation Report at "Pitt 000239," ECF No. 49-1.

Complaint in support of gender bias is refuted by the evidence of record.  The Court finds that there is no evidence that Ms. Rzepecki treated Plaintiff differently because of his gender, or that Ms. Rzepecki failed to properly question any witness.  Further both Dean Harvey and Dr. Pettigrew testified that Ms. Oyefusi did not inform either individual as to the identity of the individual who had allegedly sexually assaulted Ms. Oyefusi. App. 8; App. 9.

Moreover, Plaintiff points to nothing in the record that indicates that the exclusion of his wife's statement based on credibility and/or the exclusion of the recording that Plaintiff's wife had created was motivated in any way by Plaintiff's gender.[6]  The Student Code of Conduct provides:

> The University Investigator may consider relevant information, including evidence of pattern and the credibility of the parties and witnesses.  Both parties will be provided the opportunity to provide information and names of witnesses to the University Investigator.  The Investigator will not apply rules of evidence followed in court proceedings and will not entertain legal motions.  Legal rules pertaining to the wording of questions, hearsay, and opinions will not be applied.  Reasonable rules of relevancy will guide the Investigator in deciding on the admissibility of evidence and witness statements.  Reasonable limits may be imposed on the number of factual witnesses and cumulative evidence may be excluded.

Student Code of Conduct at "UP001067," ECF No. 49-1.  The Investigation Report explains: "[Plaintiff] submitted a second witness who was interviewed, who is his wife.  Due to this conflict of interest, and additional evidence that suggests his wife illegally recorded a conversation with the Complainant, the witness's statement was not considered credible to the investigation." Investigation Report at "Pitt 000238," ECF No. 49-1; *see also id.* at "Pitt 000239" ("The investigator along with the Title IX Coordinator explained the recording could not be used in our investigation along with his wife's statement.  The investigator made note of the items [Plaintiff] was not in agreement within the report.").  The evidence of record does not indicate that Plaintiff's

---

[6] Or, for that matter, that these decisions were based upon a formal application of the rules of evidence followed in court proceedings.

wife's statement or potentially illegal audio recording were omitted from the Investigation Report because of Plaintiff's gender, but rather due to Mrs. Nkrumah's own actions and statements, and the University's concern over the illegal nature of the recording.  The Court finds that there is no indication in the record that Ms. Rzepecki's decisions respecting witness statements, credibility, and the audio recording were in any way motivated by Plaintiff's gender.

While Plaintiff relies on the Third Circuit's decision in *Doe v. Univ. of Sciences*, 961 F.3d 203 (3d Cir. 2020) ("*USciences*") in arguing that external pressures on the University support a finding of gender bias, the Court notes that the Third Circuit, in addressing the standard for pleading a Title IX claim, explained in *USciences* that "allegations about pressure from [the Department of Education] and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination."  *Univ. of Sciences*, 961 F.3d at 210.  In this case, the Court agrees with the University that Plaintiff merely points to the 2011 Dear Colleague Letter, a previous lawsuit against the University asserting that Ms. Rzepecki was biased against a female student, and the conclusion rendered in the Investigation Report, and asserts generally that it is his belief that these external pressures are, in essence, alone sufficient to support his assertions of bias against the University in its Title IX Investigation.  It is unlikely that these assertions of external pressure alone are sufficient to *allege* a violation of Title IX, let alone prove such a violation.  *See Doe v. St. Joseph's Univ.*, 832 F. App'x 770, 774 (3d Cir. 2020) ("While some courts have properly pointed to internal or external pressure when evaluating gender bias, those cases all contained indicia of specific intent to punish male students.").  In the present matter, Plaintiff fails to offer any female comparator who was treated more favorably than Plaintiff, and fails identify any direct or other evidence of gender-based discrimination in this case.  The record is simply devoid of any evidence that Plaintiff's gender played any role in the University's Title IX investigation.

While Plaintiff takes issue with the Investigation Report's conclusion, he offers no true argument or evidentiary support for his conclusory allegations that Plaintiff's gender was a motivating factor in the University's decision to discipline Plaintiff. A court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. "At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones*, 214 F.3d at 407. The Court finds that Plaintiff has offered no support for his assertion that the University's Title IX investigation involved discrimination on the basis of Plaintiff's gender, and the Court will grant summary judgment in the University's favor on this claim.

### B. Count II (Section 1983 Claim)[7]

Plaintiff asserts that the University denied him a property interest without due process in violation of the Fourteenth Amendment when it suspended him for one year from the SOM as a result of the University's purportedly improper Title IX investigation. Am. Compl. ¶¶ 75; 79-86, ECF No. 15. In his Brief in Opposition, Plaintiff reiterates several of his assertions with respect to the University's purportedly faulty Title IX Investigation and Ms. Rzepecki's purportedly erroneous and biased Investigation Report, and particularly Ms. Rzepecki's credibility determinations and exclusion of certain evidence from the Investigation Report, and further argues

---

[7] With respect to Counts II and III, the Court notes that the University has asserted: "[Plaintiff] appears to argue that, as a state-related institution, the University is both private (for purposes of contract law) and public (for purposes of due process)[,]" Reply 4, ECF No. 57, and has further argued: (1) that "[n]o matter how [Plaintiff] characterizes it, he cannot prevail on his Section 1983 claim[,]" *id.*; and (2) that "[e]ven if the student handbook could constitute a contract – which it cannot – the record conclusively establishes that the University followed its policies[,]" *id.* at 8. For reasons discussed in further detail below, the Court agrees with the University that the evidence of record indicates that Plaintiff received the requisite due process and that the University did not breach any contract, to the extent one exists, between Plaintiff and the University, and that Plaintiff fails to make a showing sufficient to establish a due process violation or a breach of any contract. Accordingly, in resolving the University's Motion for Summary Judgment, the Court need not resolve the "private vs. public" issue, which, in any event, the Court finds is not thoroughly addressed in the parties' briefing.

that the University denied Plaintiff due process because the University did not provide Plaintiff

with a live hearing or opportunity to cross-examine the witnesses against him.  Br. in Opp'n 5-7,

ECF No. 53.  Plaintiff again cites to *USciences* in support of this argument.

Under the Fourteenth Amendment, "a state may not authorize the deprivation of a protected

liberty or property interest without providing a procedure in connection with that deprivation that

meets the requirements of due process."  *Sample v. Diecks*, 885 F.2d 1099, 1114 (3d Cir. 1989).

The United States District Court for the Middle District of Pennsylvania has explained that, to state

a procedural due process claim under 42 U.S.C. § 1983, a plaintiff must allege:

> (1) that he was deprived of a protected liberty or property interest; (2) that this
> deprivation was without due process; (3) that the defendant subjected the plaintiff,
> or caused the plaintiff to be subjected to, this deprivation without due process; (4)
> that the Defendant was acting under color of state law; and (5) that the plaintiff
> suffered injury as a result of the deprivation without due process.

*Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390, 402 (M.D. Pa. 2013) (quoting *Sample*, 885 F.2d

at 1113–14).  Third Circuit courts "have repeatedly recognized that a graduate student has a

property interest protected by procedural due process in the continuation of his or her course of

study under Pennsylvania law."  *Borrell*, 955 F. Supp. 2d at 402 (collecting cases).

"The basic elements of due process in the school disciplinary setting require that a student

facing suspension be given some type of notice and an opportunity to be heard by a fair and

impartial tribunal before any deprivation of life, liberty, or property may occur."  *Osei v. Temple

Univ. of Commonwealth Sys. of Higher Educ.*, Civil Action No. 10–2042, 2011 WL 4549609, at

*8 (E.D. Pa. Sept. 30, 2011*), aff'd sub nom. Osei v. Temple Univ.*, 518 F. App'x 86 (3d Cir. 2013)

(citing *Goss v. Lopez*, 419 U.S. 565, 579 (1975)); *see also Snyder v. Millersville Univ.*, No. CV

07-1660, 2008 WL 11511898, at *3 (E.D. Pa. Jan. 31, 2008) ("disciplinary actions require that

school officials provide the student with oral or written notice of charge against her, an explanation

of their evidence, and an opportunity for the student to present her side of the story") (citing *Goss*,

419 U.S. at 579).  The Third Circuit has explained:

> Nonetheless, what is required of due process is generally a function of: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used" and "the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)

*Osei v. Temple Univ.*, 518 F. App'x 86, 88 (3d Cir. 2013).

"In specifically addressing due process in university disciplinary settings, the Third Circuit

has held that there is no specific format the proceedings must follow, as long as the university

provides sufficient due process protections."  *Osei*, 2011 WL 4549609, at *8 (citing *Sill v.

Pennsylvania State Univ.*, 462 F.2d 463, 469-70 (3d Cir. 1972)).  The *Osei* court further explained

that "only 'significant and unfair departures from an institution's own procedures can amount to a

violation of due process.'"  *Id.* (quoting *Furey v. Temple*, 730 F.Supp.2d 380, 396-97

(E.D.Pa.2010)). "In the university disciplinary context, the right to counsel, the right to confront

witnesses, and the right to cross-examine witnesses generally have not been deemed necessary

elements of due process of law."  *Id.* at * 10.

The Court notes that Plaintiff again relies substantially on the Third Circuit's decision in

*USciences*, this time in arguing that the University failed to provide Plaintiff with sufficient due

process protections because it failed to provide Plaintiff with a live hearing or an opportunity to

cross-examine the witnesses.  *Usciences* is distinguishable in that it did not address a Section 1983

claim for an alleged due process violation, but rather involved a breach of contract claim against a

private university for failure to provide "fairness" in relation to a Title IX investigation.  *Univ. of

Sciences*, 961 F.3d at 214.  In *USciences*, the Third Circuit explained that "notions of fairness in

Pennsylvania law include providing the accused with a chance to test witness credibility through some form of cross-examination and a live, adversarial hearing during which he or she can put on a defense and challenge evidence against him or her[,]" and further explained that, although a private university is not subject to the Constitution's dues process guarantees, "the basic elements of federal procedural fairness in a Title IX sexual-misconduct proceeding include a real, meaningful hearing and, when credibility determinations are at issue, the opportunity for cross-examination of witnesses." *Univ. of Sciences*, 961 F.3d at 214-15.

The Court notes that district courts applying *USciences* have held that the Third Circuit's holding in *USciences* does not require live cross-examination of witnesses in the context of a Title IX investigation. *See Gendia*, 2020 WL 5258315, at *5 (applying Pennsylvania law and finding that a private university "fulfilled the requirements for fundamental fairness" where it permitted the parties to submit cross-examination questions to the adjudicator, and further declining "to read [*USciences*] as requiring *live* cross-examination by an accused or his representative as a prerequisite to fairness."); *Doe v. Princeton Univ.*, No. 3:20-cv-4352 (BRM)(TJB), 2021 WL 194806, at *1 (D.N.J. Jan. 20, 2021), *vacated and remanded sub nom. John Doe Appellant v. Princeton University*, No. 21-1458, 2022 WL 965058 (3d Cir. Mar. 31, 2022) ("Neither courts in New Jersey, nor the Third Circuit after *USciences*, have required live cross-examination in Title IX actions." (citing *Gendia*, 2020 WL 5258315, at *5)).[8]

---

[8] The Court acknowledges the Third Circuit's recent decision vacating the United States District Court for the District of New Jersey's decision in *Princeton*. *See John Doe Appellant v. Princeton University*, No. 21-1458, 2022 WL 965058 (3d Cir. Mar. 31, 2022). The Third Circuit's Opinion in *Princeton* was issued on March 31, 2022, and the Court has thoroughly reviewed that Opinion. The Court notes that the *Princeton* matter is distinguishable in that the complaint in that case was dismissed at the motion to dismiss stage, and that this case involves the Court's consideration of a motion for summary judgment that is subject to a different standard of review than a motion to dismiss. This Court has the benefit of a record following the completion of discovery in this matter and the University's filing of its Motion for Summary Judgment and Plaintiff's responsive documents. Moreover, the Third Circuit explained in *Princeton*:

With respect to the University's Title IX investigation, the Court again notes that the evidence of record indicates that, during the course of the investigation, Plaintiff was given the opportunity to be interviewed and present his account of the incident in question, to review interview summaries, to propose relevant evidence and witnesses, to review all drafts of the Investigation Report, to submit additional evidence and to propose cross-examination questions for witnesses (including for his accuser), to have an advisor present during any proceeding or meeting in the course of the investigation, and to appeal the Investigation Report's conclusion. With respect to cross-examination of witnesses, the Court notes that University's Student Code of Conduct provides:

> After the Investigator concludes gathering and evaluating evidence, including witness interviews, an investigation summary will be prepared.  At this time, the Complainant and Respondent will have an opportunity to review, in the Title IX Office, the investigative summary.  The investigative summary will include the relevant information provided by the Complainant, Respondent, and any witnesses, as well as other evidence gathered during the investigation which will be considered in making a determination regarding the alleged University's Sexual Misconduct Policy or Code violation.  The Complainant and Respondent must submit any comments (including additional statements, *proposed witness questions*[,] and additional evidence) concerning the summary to the Investigator within five (5)

---

We need not accept Doe's suggestion that Princeton failed to follow a "fundamentally fair" procedure solely by omitting a live hearing.  While the bright-line test Doe urges would provide precision, New Jersey courts have defined fundamental fairness contextually, focusing on the setting and circumstances. . . .  But sketching all the "aggressive[ ] protect[ions]" that might be required is unnecessary where, as here, the total mix of procedures missing from Princeton's investigation is sufficient to state a claim.

*Princeton*, No. 21-1458, 2022 WL 965058, at *8 (3d Cir. Mar. 31, 2022).  In considering the University's Motion for Summary Judgment, the Court cites to the lower court's decision in *Princeton* only for its holding that a university is not, *necessarily*, required to provide for live cross-examination of witnesses in Title IX actions.  This holding seems to be generally undisturbed by the Third Circuit's holding in *Princeton* given the Third Circuit's decision to decline to adopt the bright-line test suggested by the plaintiff in *Princeton*.  The Court notes that it has also cited to *Gendia*, which applied Pennsylvania law and interpreted *USciences* (which itself applied Pennsylvania law), in reaching a similar holding to the lower court's holding in *Princeton*.

In the present matter, this Court has considered the specific circumstances presented by the University's Title IX proceedings in this case in determining whether Plaintiff has introduced evidence sufficient to establish a genuine issue of material fact as to whether the University's investigation violated Plaintiff's due process rights.  The Court notes that Plaintiff has submitted no evidence in opposing summary judgment in this case, and the evidence of record in this case supports the Court's ultimate conclusion that the University is entitled to summary judgment as to Count II.

business days of the date that the investigative summary was first made available
for review.  This portion of the investigation may be an iterative process.

Student Code of Conduct at "UP001068," ECF No. 49-1 (emphasis added).  The Student Code of
Conduct also provides that both a Complainant and a Respondent are entitled to one advisor or
support person, which can include an attorney acting in an advisory role, and the advisor or support
person is permitted to accompany the party to any meeting or proceeding under the University's
Title IX procedures.  Student Code of Conduct at "UP001068" - "UP001069," ECF No. 49-1.

The University concedes that Plaintiff has a protectable property interest in the
continuation of his course of study at the SOM.  Br. in Supp. 15, ECF No. 50.  The Court's analysis
is thus limited to whether the University's Title IX investigation deprived Plaintiff of this property
interest without due process.  The Court concludes that Plaintiff fails to offer or point to evidence
sufficient to create a genuine issue of material fact as to whether Plaintiff was deprived of due
process during the University's Title IX investigation.  Rather, the evidence of record indicates
that Plaintiff was provided with adequate notice of the Title IX claim and the allegations at issue,
an explanation of the evidence against Plaintiff, and an opportunity to be heard by, and to present
his side of the story to, a fair and impartial tribunal.

Initially, Plaintiff does not assert that he was not provided with adequate notice of the
charges pending against him, and the record makes clear that such notice was provided.  Plaintiff
received a Notice of Investigation, met with Ms. Rzepecki to review the Notice of Investigation,
and was subsequently interviewed by Ms. Rzepecki with respect to the incident in question at a
later date at Plaintiff's request.  Plaintiff was given several opportunities to review the
Investigation Report as it was developed, and it is clear that he was on notice of the evidence the
University had considered and relied upon in reaching its conclusion to suspend Plaintiff.  As set
forth in the Court's description of the factual background of this case, Plaintiff was also provided

with an opportunity to be heard and provide his account of the incident on several occasions, have an advisor present during any proceeding or meeting in the course of the investigation, introduce his own evidence and witnesses, submit additional evidence and cross-examination questions for witnesses (including for his accuser) following review of the Investigation Report, and appeal the University's determination that Plaintiff had violated the University's Sexual Misconduct Policy and the sanctions imposed for the same.  The record further indicates that Plaintiff availed himself of these procedures, including the presence of counsel and cross-examination of his accuser.  *See* Investigation Report at "Pitt 000231," ECF No. 49-1 (during a September 24, 2018 meeting wherein Plaintiff was interviewed by the University's Title IX office and was provided an opportunity to present his account of the incident in question, Plaintiff's then-attorney was on the phone); *see also id.* at "Pitt 000239" ("At the request of [Plaintiff], the investigator asked [Ms.] Oyefusi again who was on top of who when the assault occurred.").

Further, as discussed above, the Court finds that Plaintiff has introduced no evidence of bias in the course of the University's Title IX investigation, and the Court similarly finds that there is no basis to conclude in this case that Plaintiff was denied an opportunity to be heard by an impartial tribunal.  *See Osei*, 2011 WL 4549609, at *11 ("There is a presumption of fairness in administrative proceedings which favors administrators and 'alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences.'" (citing *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 15 (1st Cir. 1988))).  Again, while Plaintiff may disagree with the outcome of the Title IX investigation, he has presented no evidence that the same was influenced by gender-based bias or prejudice.

Finally, even if *USciences* is applicable to Plaintiff's procedural due process claim under Section 1983, the University was not, necessarily, required to provide Plaintiff with an opportunity

to cross-examine witnesses at a live hearing under the Third Circuit's holding in *USciences*. *See Gendia*, 2020 WL 5258315, at *5; *Princeton Univ.*, 2021 WL 194806, at *10.  The Court notes that the failure to provide a live hearing at which Plaintiff could conduct cross-examination was raised as a basis for Plaintiff's Section 1983 claim for the first time in Plaintiff's Brief in Opposition to the Motion for Summary Judgment.  The Court further notes that Plaintiff was clearly given an opportunity to submit cross-examination questions for witnesses, and, at least to some extent, Plaintiff exercised his ability to do so.  Investigation Report at "Pitt 000239," ECF No. 49-1.  In any event, the Court finds that Plaintiff's assertion that the University violated Plaintiff's rights under the Fourteenth Amendment by failing to provide Plaintiff with a live hearing and an opportunity conduct live cross-examination of witnesses is not supported in this case.  To the extent that Plaintiff relies on *USciences* in asserting a violation of his due process rights, the Court finds that such reliance is misplaced.

While Plaintiff takes issue with the University's conclusion, Plaintiff fails to point to sufficient evidence that the University violated his due process rights or departed in any way from its Title IX procedures.  Weighing the interests at stake, the fairness and reliability of the procedures implemented by the University in this matter, and the probable value of additional procedural safeguards, the Court is satisfied that the evidence of record indicates that the University provided Plaintiff the requisite due process in the context of a university disciplinary proceeding.  Plaintiff was provided with adequate notice of the Title IX claim and the allegations at issue, an explanation of the evidence against Plaintiff, and an opportunity to be heard by, and to present his side of the story to, a fair and impartial tribunal.  For the reasons discussed above, the Court finds that Plaintiff fails to establish a genuine dispute of material fact as to his claim for a

violation of his due process rights during the course of the University's Title IX investigation, and the Court will grant the University's Motion as to Count II.

### C.  Count III (Breach of Contract)

In his Complaint, Plaintiff asserts that "Chapter 5, paragraph D, page 18 of Defendant's Student Code of Conduct, states that '…legal rules regarding admissibility of evidence will not be formally applied[,]'" and that Ms. Rzepecki breached a contract (the Student Code of Conduct) when she refused to accept and consider an audio recording during the University's Title IX investigation on the basis that the audio recording was "inadmissible."  Am. Compl. ¶¶ 90-91, ECF No. 15.  In his Brief in Opposition, Plaintiff also asserts that the University breached its duty to conduct an equitable investigation in this matter because it failed to provide Plaintiff a "real, live, and adversarial hearing and the opportunity for the accused student or his or her representative to cross-examine witnesses-including his or her accusers."  Br. in Opp'n 7-8, ECF No. 53 (quoting *Univ. of Sciences*, 961 F.3d at 212).[9]  As noted above, the University asserts that its Student Code of Conduct is not an enforceable contract between the University and Plaintiff because the University is a state-related institution, and further argues that, in any event, the record shows that

---

[9] Plaintiff's Brief in Opposition, which consists of eight total pages and six pages of substantive analysis, further provides:

> It should also be noted[] that Defendant's failure to adhere to its promise not to apply rules of evidence that are "followed in court proceedings" but rather would be guided by reasonable rules of relevancy to decide whether to include evidence or not is also a breach.  However, since Defendant's failure to comport to due process constitutes a breach of its contractual obligations to Plaintiff, he refrains from expanding on this point.

Br. in Opp'n 8, ECF No. 53 (footnote omitted).  As noted above, the Court finds that the University did not deny Plaintiff procedural due process in the context of the University's Title IX investigation, and, accordingly, also finds that Plaintiff fails to make a sufficient showing that the University breached a contract by violating Plaintiff's due process rights.  While the Court will, in resolving the University's Motion for Summary Judgment as to Plaintiff's breach of contract claim, consider Plaintiff's allegation related to Ms. Rzepecki's failure to accept and consider an audio recording created by Plaintiff's wife, the Court notes that "[i]t is not the district court's obligation to comb the record to make arguments for a party."  *Wright v. Dallas Sch. Dist.*, No. 3:05-CV-1197, 2007 WL 9775650, at *7 (M.D. Pa. July 5, 2007), *aff'd sub nom. Wright v. The Dallas Sch. Dist.*, 286 F. App'x 775 (3d Cir. 2008).

the University did not do anything to violate the Student Code of Conduct in this case.  Br. in

Supp. 16, ECF No. 50.  Plaintiff asserts that his breach of contract claim against the University

"mainly turns on: (1) whether [the University] is a public institution for breach of contract purposes

and; (2) if [the University] is not a public institution, then was there a promise that was breached."

Br. in Opp'n 7, ECF No. 53.

The Court need not address the first issue, because, even if the Student Code of Conduct

constitutes a contract between Plaintiff and the University, the Court finds that Plaintiff fails to set

forth any evidence of a breach of that contract.  "Under Pennsylvania law, 'three elements are

necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including

its essential terms[;] (2) a breach of the contract; and[ ] (3) resultant damages.'"  *Univ. of Sciences*,

961 F.3d at 211 (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of*

*Malone Middleman, P.C.*, 635 Pa. 427, 137 A.3d 1247, 1258 (2016)) (footnote omitted).  Plaintiff

has introduced no evidence of a breach of any contract between Plaintiff and the University.

Again, as noted above, the Court finds that the University did not deny Plaintiff procedural

due process in the context of the University's Title IX investigation, and Plaintiff's breach of

contract claim based on the same fails for that reason.  Further, the evidence of record indicates

that the University adhered to the procedures set forth in its Student Code of Conduct in conducting

its Title IX investigation.  The Court has also found, as discussed above, that the procedures

utilized by the University were consistent with the requirements set forth in *USciences*, which

addressed a breach of contract claim.

With respect to the audio recording that was excluded from the Investigation Report, the

University asserts:

> [T]he legal rules of evidence were not applied in this case and [Plaintiff] provides
> no evidence that the application of the legal rules of evidence resulted in the

> exclusion of the surreptitious audio recording from the investigation.  On the contrary, the evidence in the record makes clear that the University decided not to include the surreptitious audio recording out of a concern that it may have been obtained illegally and that the University's re-disclosure and/or use of the recording may constitute a separate criminal violation.

Br. in Supp. 17, ECF No. 50 (citing Concise Statement ¶ 59, ECF No. 50).  The evidence of record

supports this assertion.  Investigation Report at "Pitt 000238," ECF No. 49-1; *see also id.* at "Pitt

000239."  The Court further notes that Plaintiff admitted Paragraph 59 of the University's Concise

Statement, Response to Concise Statement ¶ 59, ECF No. 53-1, and also finds that Plaintiff's

failure to provide any substantive response, argument, or evidence to counter the University's

assertion respecting its basis for exclusion of the audio recording, and indeed Plaintiff's decision

to "refrain[] from expanding on this point," renders the University's assertion undisputed, Fed. R.

Civ. P. 56(e).  Accordingly, there is simply no factual basis to conclude that the University's

exclusion of the audio recording created by Plaintiff's wife was based upon a formal application

of the legal rules regarding admissibility of evidence.

     For the reasons discussed above, there is no evidence in this case that, to the extent the

Student Code of Conduct constituted a contract between the University and Plaintiff, the

University breached any duty owed under that contract.  In light of the above, summary judgment

in the University's favor is appropriate with respect to Plaintiff's breach of contract claim.

## IV.     Conclusion

     For the reasons discussed above, the Court will grant the University's Motion for Summary

Judgment.  An appropriate Order of Court follows.

BY THE COURT:

s/*Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: April 8, 2022

cc: All counsel of record